[Civ. No. 15594.   First Dist., Div. Two.   Feb. 17, 1954.]

ROXIE UPDECK, Respondent, v. RILEY SAMUEL,
Appellant.

Edward D. Mabson for Appellant.

Arguello and Giometti, Alex L. Arguello and Marvin G. Giometti for Respondent.

NOURSE, P. J.—Plaintiff sued on a claim of title for real property and for damages. Her action is predicated upon an alleged marriage by oral agreement at an indefinite date without either license or ceremony. At the time of the alleged oral agreement both parties were married to other persons and both marriages were in full force and effect. The original complaint alleged that the parties hereto executed an oral agreement on September 16, 1941. This was amended to read January 30, 1942. This date was changed during the trial so that the trial court found that the agreement was executed in February or March of 1942. Then it was found that on April 25, 1942, the parties engaged in a marriage ceremony and that plaintiff entered into this so-called marriage in good faith but that the defendant acted fraudulently and with intent to deceive. In March, 1942, the defendant purchased two lots in the city of Tulare for the sum of $500 and in 1946 and 1947 purchased additional lots. Title to all of said property was taken in appellant's name only and the entire purchase price was paid by him.

The evidence relating to the purported marriage and the oral agreement is in serious conflict. It should be pointed out that the plaintiff was not wholly an innocent actor in these transactions. She had been married and divorced on two previous occasions, had six children, the marriage of five of whom the plaintiff attended and witnessed. Her testimony as to the purported marriage with defendant in the city of Tulare is almost unbelievable in view of those circumstances. She said that she was living in the defendant's home with his consent while he was employed by the federal government in the Sequoia National Park; that one day the defendant came to the home in a truck of the federal service driven by a federal employee. She stated that this employee performed a marriage ceremony without a license and without other witnesses, and that before he left he took a yellow paper out of his pocket which she assumed was the marriage license. This paper was then signed by the defendant and the truck driver returned it to his pocket. Could it have been anything but the common receipt for the delivery of his goods? She admitted, however, that she had not appeared at any state or

city office for the purpose of procuring a marriage license. At the date of this purported ceremony the plaintiff was admittedly the lawful wife of a man living in Texas.

On the 30th of September, 1943, the plaintiff herein filed an action for divorce against this defendant in the county of Tulare in which she alleged they were married on April 25, 1942, and separated on November 28, 1942. Though the original complaint was offered in evidence showing her signature and verification thereof, she was led to deny it *in toto* as a witness in this case. (The importance of this item is that if the allegations of her other complaint are true, the purported marriage took place subsequent to the purchase of Lots 4 and 5 in March, 1942, and the separation, which she alleged occurred November 28, 1942, occurred prior to the purchase of the lots on August 19, 1946 and August 7, 1947. The trial court might well have found that this separation breached the oral agreement and that these later purchases did not come within that agreement.)

In 1943 defendant gave plaintiff $700 in cash which, according to his testimony, was to be used in improvement of the home owned by defendant and in which plaintiff was then living with his consent. She first denied the receipt of this but when sufficient proof was made she testified she probably burned it up.

The facility with which the plaintiff has juggled the allegations in regard to the time of the purported marriage from September 16, 1941, to January 30, 1942, to April 25, 1942, and to "February or March, 1942" makes the case most confusing because if the allegations of the former complaint can be taken as true the first purchase of these lots was made before the purported marriage and all the others were made after the separation. The case is all the more confusing because on an order denying a new trial the judgment was modified by ordering that the sum of $700 be added as an additional value to the real property, and that the property less that sum would be divided one-half to each. Thereafter a modified judgment was filed in which it was decreed that the plaintiff was the owner of one-half of all the real property subject to a lien in favor of the defendant in the sum of $350. Why she was given one-half of the money she burned does not appear.

If this was a case of a putative marriage in which the parties were entitled to one-half of the property acquired during the time of the marriage it is hard to understand why

the payment by defendant to plaintiff in the sum of $700 cash has anything to do with the interest in the real property or how a lien could be put upon the property for any portion of it.

█ On a careful reading of the evidence it seems that it is insufficient to show that a putative marriage ever existed. It is clear that both the parties were then married, that they knew they were married and not divorced, that they knew that they could not enter into a marriage relation until the prior marriages were dissolved. It does appear however from the undisputed evidence that for some period the parties were living togther in a state of adultery and that such relation was the one and only consideration for the alleged contract.

There are two fully settled principles of law which govern the decision. █ (1) An agreement for the transfer of an interest or estate in real property must be in writing (Civ. Code, §§ 1091, 1624, subd. 4). The exceptions relating to agreement between husband and wife covering their community and joint tenancy property discussed in *Tomaier* v. *Tomaier*, 23 Cal.2d 754 [146 P.2d 905] and similar cases are not applicable here because there was no valid existing marriage relation.

█ (2) The illegal oral contract was void *ab initio* because it was founded on both an unmoral and an immoral consideration. The oral contract was based on the consideration that the parties live together as husband and wife. At the time both parties were legally married to other spouses. Hence the alleged agreement called for them to live in a state of adultry. But adultery is a criminal offense under our Penal Code. Hence the parties were contracting between themselves to commit a crime. The settled rule of law is that such a contract is void *ab initio*.

█ In 6 California Jurisprudence page 124, this rule is stated: "A court will not enforce an executory contract founded on the mutual turpitude of the parties, and if the contract has been executed, it will not aid either party to escape its consequences. █ A contract which has the direct effect of promoting sexual immorality is against public policy. Thus a promise to marry, made in consideration of an agreement, on the part of the woman, to continue an immoral and illegal relation toward the promisor, is void."

Judgment reversed.

KAUFMAN, J.—I concur. The evidence in the record submitted by respondent to show a purported marriage is

incredible and unworthy of belief and therefore insufficient to sustain a finding of a putative marriage. Under these circumstances we are not reweighing the evidence or resolving conflicts but determining that there is no credible or substantial evidence in the record to sustain the lower court's finding. . (*People* v. *Headlee,* 18 Cal.2d 267 [115 P.2d 427].)

Respondent would ask a court to believe that on the day of the purported marriage appellant and a man drove up to the house in a government truck; entered the house, and the man who was not introduced to her in any official capacity or as a minister, priest or judge and who did not exhibit a marriage license, performed a marriage ceremony. This was done, according to respondent, without a witness being present and without ever having applied for a license to marry. It is significant to note that respondent had previously been married twice before, had applied for marriage licenses and had the ceremonies performed in the presence of witnesses.

Other findings of the trial court are likewise not supported by substantial evidence, but in view of the fact that the evidence is insufficient to show that respondent entered into the purported marriage in good faith, it is unnecessary to discuss them.

DOOLING, J.—I dissent. While the plaintiff's testimony presents a bizarre case on its facts and the plaintiff was impeached in certain particulars the trial judge resolved the evidence in favor of the plaintiff and under the settled rule, which is such a commonplace of our appellate procedure as to require no citation of authority, the credibility of the witnesses and the weight of the evidence are left solely to the determination of the trial court and this court cannot reweigh the evidence on appeal. It is only by reweighing the evidence that my associates are able to say: "On a careful reading of the evidence it seems that it is insufficient to show that a putative marriage ever existed."

The plaintiff testified that she arranged with a lawyer in Texas to secure a divorce from her prior husband and that in January, 1942, she received a letter from this lawyer assuring her that the divorce would be secured immediately, and believing that she was divorced she entered into what she was led by defendant to believe was a valid marriage with defendant a few months thereafter. The decree of divorce from her former husband was in fact not entered until 1944 but plaintiff did not learn of this until shortly before the

trial of this action; and while defendant also had a wife she did not know this fact and believed that he and she had entered into a valid marriage. In the face of this testimony, which the trial court made the basis of its findings, it is only by reweighing the evidence, and deciding that what the trial court believed this court does not, that the court can say: "It is clear that both parties were then married, that they knew they were then married and not divorced, that they knew that they could not enter into a marriage relation until the prior marriages were dissolved."

Equally must this court reweigh the evidence to make its finding, contrary to the finding of the trial court, that the contract of the parties called for them to live in the state of adultery. The trial court found "that plaintiff entered into said marriage in good faith, honestly believing herself to be the true and legal wife of the defendant" and that "plaintiff in reliance on the oral contract to pool assets and earnings . . . and in the belief that she was legally married to the defendant, lived with the defendant . . . as the wife of the defendant, from April 25th, 1942, to the 5th day of January, 1950."

The plaintiff was an ignorant woman who could barely read and write and her bona fides and the deception practiced on her by defendant are corroborated by the fact that defendant wrote letters to her which he signed: "Loving Husband" and represented to others in her presence that she was his wife. Even the fact that she at one time filed a suit for divorce against him, which the majority opinion cites as casting doubt on her credibility as to the date of the putative marriage, might itself be considered some corroboration of her good faith. Those considerations, however, are not our concern on appeal but were for the trial judge to consider in exercising his function, which is clearly not ours, as trier of the facts.

Under the findings of the trial court, which are supported by substantial evidence, the innocent party to the putative marriage is entitled to the quasi-community property rights which are the basis of the judgment here under attack. (*Vallera* v. *Vallera*, 21 Cal.2d 681, 683 [134 P.2d 761]; *Figoni* v. *Figoni*, 211 Cal. 354 [295 P. 339]; *Schneider* v. *Schneider*, 183 Cal. 335 [191 P. 533, 11 A.L.R. 1386]; *Coats* v. *Coats*, 160 Cal. 671 [118 P. 441, 36 L.R.A.N.S. 844].)